## ROBERTS *v.* THE STATE.

1. The giving in charge to the jury of the provisions of section 26 of the Penal Code, relative to the venue in cases where it appears that the offense was committed on the boundary line between counties, was not error on the ground that there was no evidence authorizing instructions on this subject.

2. The question whether or not the decedent had a knife in his hand at the time he was shot by the defendant was material; and the court erred in allowing a witness to testify that about two or three hours before the shooting occurred he had asked the decedent for his knife that he might use it in extracting a cork from a bottle of whisky, and the decedent had informed him that he did not have a knife. The an-

swer of the decedent to the request for his knife was hearsay, and not so connected with the main incident in the case, in point of time, as to be a part of the res gestæ.

3. There being some evidence to show improper relations between the accused and the wife of the decedent, which was denied by the accused, evidence that the decedent had said to another party, not in the presence of the accused, when asked why he and his wife parted the first time, that "he had caught Bill Roberts [the accused] and his wife in bed together," and had asked the witness if he could get a house from him to move his wife into, and, when witness said that he would see about it, decedent added, "I love my wife, and I never expect to live with her on Roberts' place again." The testimony of what the decedent said in the conversation was hearsay and inadmissible.

APRIL 13, 1916.

Indictment for murder. Before Judge Thomas. Lowndes superior court. July 3, 1915.

*E. K. Wilcox,* for plaintiff in error.

*Clifford Walker,* attorney-general, *J. A. Wilkes,* solicitor-general, *James M. Johnson,* and *Mark Bolding,* contra.

BECK, J. W. A. Roberts was indicted for the offense of murder in the slaying of Jim Wilkes. On the trial the jury returned a verdict of guilty, and recommended that the prisoner be punished by imprisonment for life. He made a motion for a new trial, which was overruled.

1. The plaintiff in error insisted, in one ground of the motion for a new trial, that there was no proof of venue. He also assigned error on the following charge of the court: "The court instructs you that the law provides that when an offense shall be committed on the boundary line of two counties, it shall be considered and adjudged to have been committed in either county, and an indictment for such offense may be found and tried and conviction thereon may be had in either of said counties." The exceptions to this charge are: (*a*) There was no evidence to show that the offense, if committed at all, was committed on the boundary line between Lowndes county and any other county; and said charge was unwarranted. (*b*) The evidence showed conclusively that the offense, if committed, was committed in Echols county, and not on the boundary line between Lowndes and Echols counties. (*c*) The rule of law embraced in the charge was not applicable under the facts as disclosed by the evidence.

We can not hold, under the evidence, that there was no proof of venue authorizing the charge complained of. The witness

Peterson, introduced by the State, testified: "The house is in Lowndes county, and the people say the lane is the dividing line between Echols and Lowndes. That is what the people say it is. . . I think the man [the decedent] was in Echols county, according to what they showed me where he was lying. I have lived in Echols county all my life, and I am forty-seven. . . I have never traced the line through there. I know by general reputation in the neighborhood where the line is. According to my understanding for the past twenty years, the place where Wilkes was lying was in Echols county, north of the line, on the Echols county side. The body was lying in Echols county eight or ten feet. I never measured it. . . During the time that he was there there was some mention made between me and some of the rest about a stob driven there to indicate the place where he was lying and they said that it was on the Echols county side, and they showed me the corner. I am satisfied it was eight feet over in Echols county. . . Wilkes was killed in the lane between the place where he was living and Westberry's place. I have not measured the distance, but I suppose the distance is about one hundred yards, or something like that, from the place where he was killed to Wilkes's house." When Wilkes was shot the witness immediately went to where the dying man was lying. He had "never measured that lane. It was fifteen feet, or may be wider. They told me that the lane is the dividing line between the two counties. I don't know which side of the lane W. A. Roberts was standing at the time the pistol was fired. I don't know whether he was in Echols or Lowndes county. From the circumstances of the dead man, he must have been in Echols. The dead man was in Echols."

J. A. Kinsey, for the defendant, testified that he lived in Echols county; that he was familiar with what was known as the county line, and had known that as the county line for thirty-odd years. From general repute in the community, and from what witness knew about it, the county line is about six or eight feet from where the body of Jim Wilkes was lying; witness did not see the body, but, two or three hours after the killing, went to where the killing was said to have occurred, and found a patch of blood, which was six or eight feet from the county line, over in Echols county. "The lane that goes in front of the house where Wilkes had been living, on Roberts's place, is a long one, and was the

county line." Another witness testified that the line between Echols and Lowndes counties lies on the side of the lane farthest from where the body was lying, and that the body was ten or fifteen feet over on the Echols county side. J. R. Westberry, for the defendant, testified that he saw tracks in the middle of the road (the lane) or a little further, on the Echols county side. "I saw tracks between those and the fence on the Echols county side. . . I saw tracks right there, right in the road, right around in the road there." These tracks were at the place where the homicide was committed. "The lane that runs from the house where Wilkes was living, down towards where I found his body, is the dividing line between Echols and Lowndes county. When I got there I saw tracks in the lane. I saw tracks right between the two fences, right in the road where the tracks were. The tracks were right there where he was killed in the road. . . When I stated to Mr. Johnson that the lane was the dividing line between Echols and Lowndes, I meant the line went right through the lane. The line is nearest to the Lowndes county side. The county line is not as wide as the lane."

Allen Westberry, for the defendant, testified that he knew the line dividing Echols and Lowndes counties; that Wilkes fell about 12 feet from the line in Echols county; and that his father, who owned land there on the Echols county side, had pointed out the line to him. "The lane is the boundary line on one side of the road. One side of the road is the boundary. As well as I can remember, the line of Lowndes, if it were surveyed out, would go right about through the edge of that lane, or that house where Mr. Roberts and Mr. Wilkes were living. The house is in Lowndes county. That is where they first started the conversation; then they went on down the lane, and Bill [Roberts] was trying to reason with him, and then the shooting took place. . . All the time that Roberts was going down the lane with him. . . I was walking right along behind them. . . All the time that Mr. Roberts was going down the lane with Jim Wilkes, I did not see the pistol. I heard the pistol when he shot Jim Wilkes, I heard the noise of it. I was back behind about eight or ten feet. I don't remember that I said a minute ago that I followed them down the lane. I was going on down the lane behind them. They were ahead of me. It was not dark, it was dusk. There

were no trees between me and them; the road is clear. I suppose I was something like six or eight or ten feet behind them when I heard the noise of the pistol. . . As they went on down the road Roberts was walking, like the house was up there [indicating]. Jim was off on this side, and Bill was on this side. Roberts was on the right-hand side. Wilkes was between him and the county line."

While several of the witnesses, as will be seen, testified directly that the body of the dead man was lying in Echols county, there is evidence from which the jury would have been authorized to find that the shooting which resulted in Wilkes's death was done while Wilkes and Roberts were walking down the road frequently referred to as the lane. And two or more witnesses testified that the lane was the dividing line between the counties; a lane ten or fifteen feet broad. One or more of the witnesses, it is true, testified that the Lowndes county line was on the side of the lane farthest from where the dead body was lying. But the jury had the right to find that the lane itself was the line between the two counties. If in laying off the county the authorities and the surveyor having the work in charge should, without surveying the line between two given points, adopt a road or lane between those two points as the line of the county, and while in that road one man should shoot and kill another in circumstances which make the shooting a crime, the slayer could be indicted and conviction be had in either county, under the statute stated in substance in the charge excepted to. Not only does the evidence of the witnesses, already quoted, tend to show that the offense was committed in the lane or road, which other testimony tended to show was the county line, but the statement of the defendant himself tends to show that the lane was the place where the shooting occurred. In part, that statement is as follows: "I did not tell him that he could get a mule, or I did not tell him that he could not; he kept going off down the road, and in a few minutes he would come back and go towards Westberry's house, and he kept on, and he made and jumped out of the buggy and put in to cussing, and we walked down the road, and he pulled out his knife and put in to cussing right, and I could not reason with him, and he jumped on me and he tried to cut me, and I shot him." If the lane or road was the line between Echols and Lowndes counties (and there

was some evidence that it was), under other evidence in the case and the statement of the defendant the jury would have been authorized to find that the offense was committed in the lane, and therefore on the line; and consequently it was not error for the court to give in charge to the jury section 26 of the Penal Code.

2, 3. Headnotes 2 and 3 require no elaboration.

*Judgment reversed. All the Justices concur.*

FISH, C. J., and ATKINSON, J., concur in the judgment of reversal, but dissent from the ruling announced in the first headnote.

EVANS, P. J. I specially concur in the holding in the first division that the evidence was sufficient to establish the venue, but I can not agree with all that is said in the opinion on that subject. I agree to the other rulings in the case.